OPINION
On January 11, 1999, Becky Leffler initiated a civil action in the Franklin County Court of Common Pleas as a result of injuries she sustained on February 10, 1997, in an elevator located in the building in which she worked. The building is commonly referred to as the "Motorists Building," labeled so because its owner is Motorists Mutual Insurance Company. On the date of the incident, Ms. Leffler was employed by a law firm, Cheek Zeehandelar, located on the eighteenth floor of the building. The complaint alleged that after Ms. Leffler entered the elevator on the eighteenth floor, the elevator "* * * suddenly plummeted two to three floors, stopping abruptly, throwing * * * [her] forcefully about."
The complaint named multiple defendants and their purported capacities in the litigation: Motorist[1] Mutual Insurance Company, the "owner and operator" of the elevator; Westinghouse Electric, the "manufacturer, seller and installer" of the elevator; Stephen Wiehoff, the state-certified "inspector" of the elevator; Schindler Elevator Corporation, the elevator service provider; and, American Electric Power ("AEP"), the utility company which provided electrical service to the building. The complaint set forth various claims of, inter alia, negligence, breaches of warranties, defective product, and negligence per se ("violations of state law").
On January 27, 1999, an answer was filed on behalf of defendant Motorists Mutual Insurance Company ("Motorists Mutual"), in which it substantively admitted only that "there is an elevator in the Motorists Building" and that Motorists Mutual is a duly-licensed insurance company incorporated in Ohio. Beyond those admissions, the answer asserted general denials of liability. In the event Motorists Mutual were to be found liable, however, the answer also included a cross-claim seeking contribution and/or indemnity among any other defendants also found liable.
An answer was filed on behalf of Stephen Wiehoff on February 12, 1999. He admitted that he is a "certified elevator inspector" and that he inspected elevators in the Motorists Building. Otherwise, Mr. Wiehoff generally denied the allegations of Ms. Leffler's complaint. On March 11, 1999, an answer responding to Motorists Mutual's cross-claim was also filed on Mr. Wiehoff's behalf.
The next defendant to file an answer was "Columbus Southern Power dba American Electric Power"[2] on February 23, 1999. It admitted only supplying electricity to the Motorists Building. AEP also filed a separate answer denying relevant allegations set forth in Motorists Mutual's cross-claim.
Upon motion for leave to file amended answers, granted in July 1999, AEP filed amended answers to both the complaint and the cross-claim, adding additional defenses. In particular, it argued that the cross-claim was barred based upon the "language of the tariff on file" (terms and conditions of service) with the Public Utilities Company of Ohio ("PUCO") and by language in the contract between Motorists Mutual and AEP.
On March 12, 1999, an answer to the complaint was filed on behalf of both Schindler Elevator Corporation ("Schindler Elevator") and Westinghouse Elevator Company ("Westinghouse"), a division of the Schindler Corporation. A separate answer to Motorists Mutual's cross-claim was also filed.
In July 1999, Motorists Mutual voluntarily dismissed its cross-claim against AEP.
On July 14, 1999, AEP filed a motion seeking summary judgment. The trial court ultimately granted summary judgment to AEP in a decision rendered September 2, 1999, and journalized in an entry filed September 20.
Counsel for defendant Stephen Wiehoff filed a motion for summary judgment on October 15, 1999. Following further discovery proceedings and briefings, the trial court ultimately granted the motion in an entry journalized December 11, 2000.
In August 2000, the trial court granted Ms. Leffler's motion to join the Ohio Bureau of Workers' Compensation ("BWC") as a third-party plaintiff because of the BWC's subrogation interest in the case. As a result, Ms. Leffler filed an amended complaint on August 17, 2000. In turn, the remaining defendants filed answers to the amended complaint.
On September 19, 2000, counsel for Ms. Leffler and AEP filed stipulations which included the acknowledgement that AEP had been granted summary judgment and AEP was included as a defendant in the amended complaint only to preserve any appellate rights potentially arising therefrom. Notwithstanding the stipulation, on October 2, 2000, counsel for AEP filed a motion to dismiss the BWC's complaint based upon the earlier grant of summary judgment.
On October 12, 2000, the Ohio Attorney General's office, counsel for the BWC, filed a notice of voluntary dismissal as to AEP.
On November 13, 2000, both Ms. Leffler and the BWC voluntarily dismissed their respective claims against Motorists Mutual.
The remaining parties filed a joint motion to vacate the pending scheduling orders and to refer the case to mediation. The court granted the motion.
On March 16, 2001, a motion for summary judgment was filed on behalf of defendants Schindler Elevator and Westinghouse. In June 2001, the trial court granted the motion.
All claims and defendants having been effectively dismissed from the action, an entry terminating the case was filed on June 26, 2001.
Becky Leffler (hereinafter "appellant") has timely appealed, only with respect to her claims against Schindler Elevator and Westinghouse, the latter being a division of Schindler Corporation (hereinafter collectively "Schindler"). In essence, appellant maintains that Schindler was negligent in its inspection and maintenance of the elevator in which she was riding and/or negligent in its manufacture or installation of the elevator. Appellant also advanced theories of breached expressed or implied warranties.
Appellant has assigned seven errors for our consideration:
 1. The trial court erred in granting motion of Schindler Elevator Corporation (Schindler) for summary judgment and in entering judgment for that defendant.
 2. The court erred in rejecting the first affidavit and opinion of plaintiff's expert Buckman that negligent misalignment between the nylon block assembly and the drive vane on elevator 6 at the 16th floor caused the abrupt stop and injury to plaintiff on the asserted basis that there was too much time between the injury to plaintiff on February 10, 1997, and Buckman's inspection on November 19, 1999, and that no evidence was presented showing the evidence of the elevator's condition at the time of plaintiff's injury.
 3. The court erred in ruling that the report of Max Barry, dated September 26, 1997, was unverified and failed to comply with [Civ.R. 56(C)].
 4. The trial court erred in excluding expert Buckman's opinions because he "is not an engineer."
 5. The court erred in ruling that "even if the elevator's service history were consistent with and `supportive' of Buckman's opinions, the service history is insufficient to constitute evidence of the elevator's condition at the time of plaintiff's accident."
 6. The court erred in ruling that expert Buckman failed to identify the "additional depositions" which he reviewed prior to rendering his supplemental affidavit.
 7. The trial court erred in excluding expert Buckman's opinion that "recent discovery has revealed that on elevator No. 6 there was a FR-1 relay `cold solder' that ultimately had to be repaired and was therefore a cause of the `speed hump' experienced by plaintiff."
Appellant's first assignment of error attacks the trial court's grant of summary judgment generally, with incorporation by reference to the remaining assignments of error. The remaining assignments of error, actually posed oft-times as overlapping "issues" throughout appellant's brief, challenge with specificity the court's purported erroneous evidentiary rulings and resulting conclusions. With one exception, the specific assignments of error particularly challenge those rulings with respect to appellant's expert witness Charles A. Buckman.
As fundamental factual background, from appellant's perspective, we look to her answer to an interrogatory in the record to ascertain her personal recollection of the February 10, 1997 basic events giving rise to this litigation:
 [Appellant] arrived at work, Cheek Zeehandelar, at approximately 6:40 a.m., and at approximately 6:55 a.m., [appellant] and Judy Bailey entered the Motorist[s] Mutual Building elevator #6, on the eighteenth floor, in order to go to the second floor for coffee. Upon entering, the doors shut, the lights flickered, and the elevator quickly fell to the 16th floor, where it stopped abruptly, and according to Judy Bailey, caused [appellant] to seem "compressed" and then fall to the floor. The doors quickly opened and slammed shut, and the elevator continued to fly downward. It eventually slowed down, and came to a stop at the second floor. Within minutes, [appellant] was in pain. [Appellant] returned to work for the rest of the day, and the next day [appellant] worked for a short time, and then went to St. Ann's Emergency Room.
The "facts" and opinions as adduced by others, including experts, as to the cause of the incident are delineated below. In reviewing such evidence introduced by the parties, however, we are mindful of the standard by which we are bound in reviewing a summary judgment.
Summary judgment motions and proceedings are prescribed by Civ.R. 56. Civ.R. 56(C) provides, in pertinent part, as follows:
 * * * Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. No evidence or stipulation may be considered except as stated in this rule. A summary judgment shall not be rendered unless it appears from the evidence or stipulation, and only from the evidence or stipulation, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor. [Emphasis added.]
In construing Civ.R. 56, case law has consistently reaffirmed that summary judgment is appropriate when, as the rule expressly states, construing the evidence most strongly in favor of the nonmoving party, (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion, that conclusion being adverse to the nonmoving party. Zivich v. Mentor Soccer Club, Inc. (1998),82 Ohio St.3d 367, 369-370, citing Horton v. Harwick Chem. Corp. (1995),73 Ohio St.3d 679, paragraph three of the syllabus. Appellate review of the appropriateness of summary judgment is de novo.[3] Smiddy v. The Wedding Party, Inc. (1987), 30 Ohio St.3d 35.
Appellant's case was essentially based upon a theory that Schindler was at fault for her injuries due to its negligence in failing to inspect and maintain the elevators in the Motorists Mutual Building. In support thereof, appellant presented evidence in defense of Schindler's summary judgment motion, and in support of her allegations that Schindler had essentially ignored "excessive service complaints and malfunctions" pertaining to the elevators in general and to elevator No. 6 in particular.
Depositions and affidavits of both appellant and Ms. Bailey are included in the record. This evidence consistently establishes that the elevator "rapid[ly] drop[ped]" like a "free fall. The elevator "rocked back and forth." There was an "abrupt stop" at the sixteenth floor. The doors opened suddenly, and then closed immediately. The elevator car continued at a rapid speed to the second floor stop. (Leffler deposition at 26, 87-90; Bailey deposition at 17-21, 26, 35.)
Charles Buckman, appellant's expert, had in excess of forty years experience in the field of elevators, thirteen of which were in the employ of Schindler/Westinghouse. Mr. Buckman submitted two affidavits in which he opined regarding the inadequate maintenance by Schindler which ultimately caused this incident.
Mr. Buckman's first affidavit resulted from his November 19, 1999 inspection of elevator No. 6. Because Mr. Buckman's affidavits and contents therein are the primary subject of contention in this appeal, we quote them at length. In pertinent part, his first affidavit reads as follows:
 1. * * * [M]y name is Charles [A.] Buckman, CSS. CEI. and attached hereto is a current Curriculum Vitae illustrating my credentials;
 2. * * * I have been retained by [appellant's law firm] to investigate the February 10, 1997 elevator accident involving [appellant];
 3. * * * I have reviewed the only available Deposition of Elevator Inspector Stephen Wiehoff as well as various documents from Defendant Stephen Wiehoff, Defendant Schindler Elevator Corporation, Defendant Motorist[s] Mutual Insurance, and the State of Ohio;
 4. * * * [O]n November 19, 1999, I personally inspected and photographed elevator number six * * * located at [Motorists Mutual Building] * * *;
 5. * * * The discovery of the facts of the case have not been completed at this point, and therefore that, although my professional opinions formulated as an elevator safety professional certified by the World Safety Organization as a Certified Safety Specialist Elevator, Certification Number 776, certified by the National Association of Elevator Safety Authorities (under the aegis of the American Society of Mechanical Engineers) as a Certified Elevator Inspector * * * and by my 46 years of elevator industry technical and code experience, as rendered hereafter are based on a reasonable degree of engineering probability, they may well be modified upon completion of all necessary discovery;
 6. * * * [A]t or about the time of this incident there was a momentary power reduction;
 7. * * * [I]t is my opinion that, while there was a momentary power reduction that may have contributed in some fashion to this event, such as the momentary loss of the lights in the elevator, I do not believe that aforesaid momentary power reduction was the proximate cause the event that cause injury to [appellant];
 8. * * * [T]he car call signal calling for the elevator to run to and stop at the second floor, registered prior to the event by [appellant], was maintained throughout the event that caused injury to [appellant] thereby indicating that the second floor relay was not de-energized during this event;
 9. * * * [M]y inspection disclosed that the door system installed on elevator number 6 was comprised of a motorized elevator car door upon which was mounted a collapsible drive vane which interacted with a nylon door drive block assembly, which was mounted on the hoistway door;
 10. * * * [T]he purpose of the nylon door drive block assembly was to cause the hoistway door to become unlocked, open and close;
 11. * * * [M]y inspection indicated that the unlocking side of the nylon door drive block assembly on the 16th
floor was scarred indicating that it had often been struck by the collapsible drive vane mounted on the car door which indicated the nylon door drive block assembly and the drive vane had been misaligned for an indeterminate length of time;
 12. * * * [I]t is the affiant's opinion, based on a reasonable degree of engineering probability, that the misalignment of the hoistway door nylon door drive block assembly and the car door drive vane caused the abrupt stop of the elevator above the sixteenth floor and the opening and instant closing thereafter of the sixteenth floor doors subsequent to the elevator leveling into the sixteenth floor;
 13. * * * Inspector Stephen Wiehoff had testified that he inspected approximately forty elevators per week, indicating that he was averaging one elevator inspection per hour;
 14. * * * [I]t is further the opinion of this affiant that is not possible to competently inspect the elevators at [Motorists Mutual Building] * * *, averaging one elevator inspection per hour;
 15. * * * [I]t is further this affiant's opinion that the evidence of scarring at the sixteenth floor should have been observed, noted and understood by Defendant Inspector Stephen Wiehoff as requiring correction. That if the cause of the scarring had been corrected in a timely fashion the accident of February 10, 1997 involving [appellant] would not have occurred. [Emphasis added.]
After this initial affidavit, Mr. Buckman reviewed "additional depositions, an affidavit of Building Manager Denny Krebs which revealed for the first time a long-time history of inadequate maintenance of the Motorist[s] Mutual elevators, and a report of a Mr. Max Barry." (Supplemental Affidavit at 1.)
Given its gravity, we quote Mr. Buckman's January 9, 2001 supplemental affidavit, again at length:
 2. * * * With this additional information, I have formed additional opinions, all of which are based on a reasonable degree of engineering probability.
 3. Since defendant Schindler argues a power sag caused the events on February 10, 1997, it is important to realize that the subsequent event that occurred in April of 1998 to Attorney Jim Zury in the same elevator is extremely relevant to this case. Jim Zury was intending to get off the elevator on the 18th floor, but the doors failed to open. The elevator then began a rapid descent, coming to an abrupt hard stop described "like hitting a concrete wall." There was no power sag. Zury's description of the stop is a classic example of an elevator striking the hoist way door drive block. This is known in the industry as a "lock stop" phenomenon. It is basically identical to the stopping experienced by [appellant] and Judy Bailey. Prior to the accident there were numerous recorded examples of this "lock stop" phenomenon, namely, on August 30, 1996, September 19, 1994, November 30, 1994, December 12, 1995, February 23, 1996, October 10, 1996.
 4. My inspection on November 19, 1999, was and is relevant to my opinions, as it was and is relevant to the opinion of defendant's expert, Robert Lauer. The malfunction history of elevator No. 6 prior to this accident * * * is supportive evidence that the scarring on the "nylon door drive block assembly" long preceded the event of February 10, 1997. Thus, my inspection of November 19, 1999, and the findings therein are relevant and supportive of my opinion. * * * [Emphasis added.]
Mr. Buckman ultimately concluded as follows:
 In summary, after the additional discovery taken following the Steven Weihoff deposition, it is my opinion that the following occurred: (1) Schindler failed to exercise reasonable elevator maintenance care in their inspection and maintenance of these elevators; (2) that this accident would not have occurred if Schindler had used reasonable care in the inspection and maintenance of elevator No. 6; that they failed to properly inspect and maintain the hoist way drive blocks is evidenced by numerous previous "lock-stop" experiences * * *; (3) Schindler fell below the expected standard of maintenance companies and their failure was a direct and proximate cause of the accident and resulting injuries to Becky Leffler.
In sum, Mr. Buckman opined that the "rapid drop" referred to by both appellant and Ms. Bailey resulted from the "FR-1 relay" that had a "cold solder" which sporadically disrupts the flow of current through the relay and results in a "speed hump" or rapid descent. The incomplete "cold solder" was discovered less than four months after the accident, May 28, 1997. (Buckman Supplemental Affidavit at 5; Robert Ashmore [former service representative] deposition at 134.)
Russell ("Denny") Krebs, then the building manager for Motorists Mutual, submitted an affidavit in which he addressed the maintenance history of the elevators in the building, including the one in which appellant was riding. Appended to his affidavit is a copy of the maintenance agreement between Motorists Mutual and Schindler which was in effect at the time of the incident. In his affidavit, Mr. Krebs states, in pertinent part:
 4. Affiant says that he does not have, either by training or education, the capability of rendering any opinions as to the reason the elevators malfunctioned in 1995, 1996 and 1997, nor does he have any opinion specifically related to the cause of the events on February 10, 1997.
 5. During 1995, 1996 and early 1997, Motorists had many difficulties with the elevators serviced by Schindler and that Motorists had many more service calls on Elevators 1-6 under Schindler than Motorists has now had under its recent contract with Otis.
 6. After Mr. Ashmore [the former service representative] was replaced, Mr. Steve Foreman worked on the elevators and on occasion pointed out to Affiant where Mr. Ashmore, rather than replacing relays, would simply file down the carbon tips of the relays.
 7. Due to the numerous service problems with the elevators, Schindler agreed that there was a maintenance problem and agreed to employ an outside consultant, Max Barry, to inspect all of the elevators and make recommendations. A copy of his report is attached hereto.
 8. Affiant says that on February 10, 1997, he recalls that there was a report that the lights flickered, but he has no recall of any other elevator malfunction * * *.
 9. Complaints were made about Robert Ashmore and his inadequate maintenance of the elevator to Schindler and as a result of those complaints, he was removed from the building as the service representative.
 10. That prior to the incident involving Becky Leffler, Motorists had repeatedly notified Schindler of problems with the elevators, and particularly Elevator No. 6, and that Motorists had, whenever complaints were registered, forwarded such complaints on to Schindler and requested service and correction of such problems.
 11. That the maintenance agreement attached hereto includes Elevator No. 6 which is the elevator at the Motorists Building in which [appellant] was riding at the time she claims injury. Affiant says that the service agreement provides that Schindler will provide all safety tests that are necessary and will maintain the elevators in the Motorists Building.
 12. That the drive block and drive vane, referred to in the affidavit of Charles Buckman and testimony of Charles Buckman, pursuant to the maintenance agreement between Motorists and Schindler, are exclusively within the responsibility of Schindler to maintain and keep in good repair.
 13. That attached hereto as Exhibit 2 * * * is the service operations work report of Schindler Elevator Corporation with regard to the incident in question. Said record indicates that Schindler was called promptly, investigated the problem, and "no trouble found."
The report of consultant Max Barry, referred to and appended to Mr. Krebs' affidavit, indicates that Krebs "expressed great concern * * * concerning elevator problems" and that Krebs "* * * expressed concern over an up coming [sic] State Inspection that will certify Motorist[s] elevators for another year."
The record supports appellant's contention that Schindler's own employee, Robert Ashmore, and its own expert, Mr. Lauer, conceded that a "cold solder" of the "FR-1 relay" would feel like a free-fall, and "could land a little harder." (Ashmore deposition at 135-138; Lauer deposition at 172-173.) In sum, Schindler's own evidence tends to support Mr. Buckman's theory as to the cause of the rapid descent and abrupt stop of the elevator. The "power sag" theory advanced by Schindler is not supported by this record in that its own evidence suggests that a "power sag" would slow down, not accelerate, the elevator's descent.
The trial court first dismissed the "Zury and Buckman affidavits" as being "not evidence of the elevator's condition at the time of the accident" because of the "length of time between the accident and both Buckman's inspection and the Zury incident." Thus, the trial court determined, "it is impossible to determine whether the observed conditions were the cause of plaintiff's accident." (Decision at 6.)
The report of Max Barry, "(dated Sept. 26, 1997-seven and one-half months after the accident)" was summarily rejected as "unverified and * * * not meet[ing] Civ.R. 56C's requirements." The court concluded that, "[i]n any event, this document concerns maintenance and repair but does not address the condition of the elevator at the time of [appellant's] accident." [Id. at 7.]
While the trial court implicitly recognized that Mr. Krebs' affidavit served to outline service and maintenance problems, complaints about the elevator, and "Schindler's sole responsibility for maintenance," the court essentially rejected as meaningless the substance of Krebs' affidavit, including the appended report of Max Barry, reasoning as follows:
 * * * Krebs explicitly states that "he does not have, either by training or education, the capability of rendering any opinions as to the reason the elevators malfunctioned in 1995, 1996 and 1997, nor does he have an opinion specifically related to the cause of the events on February 10, 1997." * * * Krebs "says that on February 10, 1997, he recalls that there was a report that the lights flickered, but he has no recall of any other elevator malfunction, nor has he recalled that any digital clocks, computers or other such equipment had to be re-set or adjusted that day." * * * Also, to the extent that the documents attached to Krebs' affidavit-Max B[a]rry's September 26, 1997 report and Schindler['s] * * * report (signed by B[a]rry and dated September 22, 1997) — are being used to demonstrate the truth of the matter asserted, such use does not conform to Civ.R. 56(E), and these documents are unverified. [Id.]
With respect to the affidavits of appellant's expert, Charles A. Buckman, the trial court found them to be "deficient" as well, in four delineated respects:
 * * * [I]n addition to Buckman's original affidavit, [appellant] submits the "Supplemental Affidavit of Charles A. Buckman." However, Buckman's "supplemental" affidavit is also deficient.
 One, Buckman is not an engineer, so he is unqualified to offer opinions which are "based on a reasonable degree of engineering probability." * * * Two, Buckman fails to identify the "additional depositions" which he reviewed; and the unverified document by B[a]rry and Krebs' affidavit do not address the elevator's condition at the time of [appellant's] accident. * * *
 Three, Buckman states that "[t]he malfunction history of elevator No. 6 prior to this accident * * * is supportive evidence that the scarring on the `nylon door drive bock assembly' long preceded the events of February 10, 1997. Thus, my inspection of November 19, 1999, and the findings therein are relevant and supportive of my opinion." * * * However, even if the elevator's service history were consistent with and "supportive" of Buckman's opinions, the service history is insufficient to constitute evidence of the elevator's condition at the time of [appellant's] accident. Buckman's November 19, 1997 inspection was made more than two and one-half years after [appellant's] accident, and there is no indication as to whether the "scarring" occurred before or after (or both before or after) [appellant's] accident or, if "scarring" were present at the time of [appellant's] accident, the extent of the scarring at the time of the accident and that which may have occurred between the time of the accident and the time of Buckman's inspection.
 Four, Buckman's statement that "[r]ecent discovery has revealed that on elevator No. 6 there was an FR-1 relay `cold solder' that ultimately had to be repaired" and so "caused a `speed hump'" fails to identify the basis for these opinions. As such, opinions based on this unidentified "recent discovery" do not constitute evidence which may be used to oppose summary judgment." [Id. at 7-9; emphasis added.]
We do not agree with the trial court's analysis of the admissibility of Charles A. Buckman's affidavit for purposes of considering the motion for summary judgment.
Evid.R. 702 sets forth three prerequisites for a witness to testify as an "expert:"
 (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons * * *;
 (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony; [and]
 (C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:
 (1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;
 (2) The design of the procedure, test, or experiment reliably implements the theory;
 (3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.
Evid.R. 703 addresses the appropriate bases of an expert's opinion testimony:
 The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by him or admitted in evidence at the hearing.
Evid.R. 704 provides that an expert's testimony, "* * * in the form of an opinion or inference otherwise admissible is not objectionable solely because it embraces an ultimate issue to be decided by the trier of fact."
Evid.R. 705, of particular significance in this case, reads:
 The expert may testify in terms of opinion or inference and give his reasons therefor after disclosure of the underlying facts or data. The disclosure may be in response to a hypothetical question or otherwise.
Charles A. Buckman clearly satisfied the prerequisites of Evid.R. 702. His extensive experience more than qualified him to render an expert opinion.
The opinions he rendered were based upon his personal observations and upon evidentiary material which was before the court. For purposes of a summary judgment motion, the requirements of Evid.R. 703 were met.
Evid.R. 704 and 705 are not a bar to Mr. Buckman's affidavits. In fact, Evid.R. 704 and 705 encourage the admissibility of such affidavits.
We do not view the fact that Mr. Buckman is not an engineer as determinative of his ability to render an opinion about how elevators function, any more than we would view the opinion of a registered nurse as inadmissible in a case involving medical knowledge. Persons other than those at the top of a profession can render admissible expert testimony under the Ohio Rules of Evidence.
Further, experts are always rendering opinions about inferences they draw from facts observed at a time before or after the incident which causes injury. A professional in elevator repair and maintenance is rarely, if ever, standing in an elevator shaft when the elevator malfunctions. Still, the expert theorizes about what went wrong. Mr. Buckman had several different factual bases from which he could draw his conclusions about why the elevator malfunctioned when Ms. Leffler was inside it.
As a result of our analysis, we sustain the second, fourth, fifth, sixth and seventh assignments of error.
We also believe that the report of Max Berry was a document which was capable of consideration by the trial court in rendering its decision on summary judgment. Mr. Barry was a consultant who made a report to Schindler about the elevator in question. The document was maintained as a business record and would ordinarily be admissible as a business record of Schindler.
The third assignment of error is sustained.
Because the trial court erred in its treatment of critical evidentiary matters, the trial court granted summary judgment inappropriately.
The first assignment of error is sustained.
All seven assignments of error having been sustained, the judgment of the trial court is reversed. The case is remanded for further appropriate proceedings.
Judgment reversed and cause remanded.
BROWN, J., concurs.
BOWMAN, J., concurs separately.
[1] While the complaint, some portions of the record, and some briefs refer to this defendant as "Motorist" Mutual Insurance, the record clarifies that the accurate name of the company is "Motorists" Mutual Insurance Company.
[2] On the same date, a stipulation between counsel for Ms. Leffler and defendant "American Electric Power" was filed, in which those parties agreed that "Columbus Southern Power dba American Electric Power" would be substituted in place of American Electric Power. For ease of discussion, we refer to this defendant as "AEP," as is the consistent reference in both the trial court and before this court.
[3] Counsel for Schindler apparently misunderstands or misstates the standard of review in summary judgment cases. In appellee's brief, counsel opines that "[t]his appeal involves only evidentiary issues." (Brief at 7.) Although counsel then correctly states that certain "admissibility" issues are subject only to an abuse of discretion standard, all such issues are not. When a trial court rules that certain evidence is "inadmissible as a matter of law," not as a matter of the court's "discretion," such ruling becomes subject to the de novo standard of review. The reader of appellee's brief alone might erroneously conclude that the de novo standard of review is not applicable here. By definition, "summary judgment" is just that summary, thus depriving a litigant his or her "day in court." The rationale for the less deferential de novo standard is thus clear and most appropriate. [Emphasis added.]